## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AHTESHAM AHMED, derivatively on behalf of ZUORA, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) |
| MARC DIOUANE, PETER FENTON, KENNETH A. GOLDMAN, TIMOTHY HALEY, JASON PRESSMAN, TYLER SLOAT, TIEN TZUO, MICHELANGELO VOLPI, and MAGDELENA YESIL, | ) ) ) ) ) ) ) ) |
| | C.A. No. _____-_____ |
| Defendants, | ) ) |
| - and - | ) |
| ZUORA, INC., | ) ) |
| Nominal Defendant. | ) |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Ahtesham Ahmed ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Zuora, Inc. ("Zuora" or the "Company"), against Individual Defendants Marc Diouane ("Diouane"), Peter Fenton ("Fenton"), Kenneth A. Goldman ("Goldman"), Timothy Haley ("Haley"), Jason Pressman ("Pressman"), Tyler Sloat ("Sloat"), Tien Tzuo ("Tzuo"), Michelangelo Volpi ("Volpi"), and Magdalena Yesil ("Yesil") (collectively, the "Individual Defendants," and together with Zuora, the "Defendants") for breaches of fiduciary duties, unjust enrichment, waste of

corporate assets, and violations of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Zuora with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action that seeks to remedy wrongdoing committed by Zuora's current and/or former directors and officers from 2018 through the present day (the "Relevant Period').

2.     Zuora is a software company that designs and sells service applications for companies.  The Company is a cloud-based subscription platform that provides software to enable companies across multiple industries and geographies to launch, manage, or transform to a subscription-based model.

3.     The Company has two primary products: Zuora Billing ("Billing"), a subscription billing software, and Zuora RevPro ("RevPro"), a revenue recognition software.

4.     The Company started as a private company in 2006. On April 12, 2018, Zuora filed its IPO Prospectus with the SEC (the "Prospectus"), confirming its plans to become a public company.

5.     The Prospectus listed several boilerplate warnings regarding potential risks to the Company, including, *inter alia*, the possibility that: (a) the Company's salesforce would fail to achieve the effectiveness needed to sustain growth; (b) the Company may fail to sufficiently or efficiently incorporate RevPro into its core operations; and (c) the market for RevPro would dry up after the deadline for implementing Accounting Standards Update ("ASU") 2014-09 for revenue recognition.

6.     During the Company's fiscal year 2019, the Company's SEC filings failed to admit that these "potential" risks were already problems within Zuora's business.

7.     Indeed, on May 30, 2019, news about Zuora's challenges with its two primary products were finally revealed. Zuora lowered its revenue guidance by $15.5 - $21 million from its previous range to $268 -$278 million for the 2020 fiscal year. On this news, Zuora's stock plummeted almost 30% representing the worst day of trading in Zuora's history as a public company and obliterated roughly $520 million of market capitalization.

8.     Unfortunately, as discussed in detail below, the Individual Defendants

breached their non-exculpable fiduciary duties of loyalty and good faith by: (a) failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf; (b) concealing the existence of significant technical challenges related to the Company's two core products (Billing and RevPro); and (c) taking advantage of the Company's artificially inflated stock price by selling their own shares for over $49 million in insider trades.

9.    Because of the Individual Defendants' misconduct, which has subjected Zuora, defendant Tzuo, Zuora's President and Chief Executive Officer ("CEO"), and defendant Sloat, Zuora's former Chief Financial Officer ("CFO"), to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

10.    Indeed, on April 28, 2020, the Securities Class Action against the

Company and defendants Tzuo and Sloat was sustained in its entirety. In her opinion denying the motion to dismiss the Securities Class Action, U.S. District Judge Susan Illston concluded, among other things, that it had been sufficiently alleged that defendants Tzuo and Sloat "were in possession of contemporaneous, contradictory information when they made [] false and misleading statements, giving rise to a strong inference of scienter." The allegations in the Securities Class Action are based on, among other things, the accounts of four confidential witnesses, all of whom are former Zuora employees.[1]

11.     Furthermore, in light of the breaches of fiduciary duty by the Individual Defendants, their collective engagement in the wrongdoing alleged herein, the substantial likelihood of liability in the Securities Class Action and this derivative action, the Individual Defendants' longtime relationships with each other, and their not being disinterested or independent, a majority of Zuora's Board of Directors (the "Board") cannot consider a demand to commence litigation on behalf of the Company.

## JURISDICTION AND VENUE

[1]     All allegations referencing the accounts of confidential witnesses, or "CWs", are based on those accounts as they appear in the Securities Class Action.

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under §§14(a), 10(b), and 21D of the Exchange Act, 15 U.S.C. § 78n and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.     This Court has personal jurisdiction over the Company because it is incorporated in this District, and each of the Individual Defendants has minimum contacts with this District to justify the exercise of jurisdiction over them.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

17.     Venue is proper in this District because Zuora is incorporated in Delaware, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

18.     Plaintiff Ahtesham Ahmed is a current stockholder of Zuora common stock. Plaintiff has continuously held Zuora common stock at all relevant times.

**Nominal Defendant**

19.     Nominal Defendant Zuora is a Delaware corporation, headquartered at 3050 South Delaware Street, Suite 301, San Mateo, California 94403.  The Company has approximately 600 employees and 1,000 customers, including Caterpillar, The Financial Times, HBO, Ford and General Motors. Zuora's stock trades on the New York Stock Exchange ("NYSE"), under the symbol "ZUO." Throughout the Relevant Period, Zuora disseminated SEC filings, press releases, investor presentations, marketing materials, product descriptions, and other reports containing material misrepresentations and omissions regarding the difficulties surrounding the performance of its two core products.

**Individual Defendants**

20.     Defendant Diouane served as President of the Company from March 2014 until June 2019.

21.     Defendant Tzuo is, and was at all relevant times, the Chief Executive Officer ("CEO"), Chairman of the Board, and co-founder of Zuora. According to the Company's Schedule 14A filed with the SEC on May 8, 2019 (the "2019 Proxy Statement"), as of March 31, 2019, Defendant Tzuo beneficially owned 21,401,650

shares of the Company's common stock, which represented (a) 25.6% of the Company's voting power; and (b) approximately $200.6 million worth of Zuora stock, on that date.

22.     Defendant Sloat served as Zuora's CFO from 2010 until his resignation, effective April 5, 2020.

23.     Defendant Peter Fenton has served as a Company director since December 2007 and serves as a member of the Audit Committee.  According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Fenton beneficially owned 7,791,086 shares of the Company's common stock, which represented (a) 20.9% of the Company's voting power; and (b) approximately $156 million worth of Zuora stock, on that date.

24.     Defendant Goldman has served as a Company director since February 2016 and serves as Chair of the Audit Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Goldman beneficially owned 231,058 shares of the Company's common stock (or approximately $4.6 million worth of Zuora stock) on that date.

25.     Defendant Haley has served as a Company director since October 2010, as Chair of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Haley beneficially owned 3,109,032 shares of the

Company's common stock (or approximately $62.27 million worth of Zuora stock) on that date.

26.    Defendant Pressman has served as a Company director since September 2008. He also serves as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Pressman beneficially owned 2,805,074 shares of the Company's common stock (or approximately $56 million worth of Zuora stock) on that date.

27.    Defendant Volpi has served as a Company director since November 2011. He also serves as a member of the Audit Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Volpi beneficially owned 1,428,157 shares of the Company's common stock (or approximately $28.6 million worth of Zuora stock) on that date.

28.    Defendant Yesil has served as a Company director since May 2017. She also serves as Chair of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 31, 2019, Defendant Yesil beneficially owned 157,204 shares of the Company's common stock (or approximately $3.15 million worth of Zuora stock) on that date.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     Each Individual Defendant, by virtue of his/her position as a director and/or officer, owed to Zuora and to its stockholders the fiduciary duties of loyalty and care.  The Director Defendants were, and are, required to act in furtherance of the best interests of Zuora and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.

30.     The Director Defendants, because of their positions of control and authority as directors and/or officers of Zuora, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Zuora, each Individual Defendant had knowledge of material non-public information regarding the Company.

31.     To discharge their duties, the officers and directors of Zuora were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Zuora were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable

federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c. Exercise good faith to ensure that the Company's communications with the public and with stockholders are made with due candor in a timely and complete fashion; and

d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

32.    In addition, certain of the Individual Defendants are members of the Audit Committee. Pursuant to Zuora's Charter of the Audit Committee, members were required to, among other things:

a. Assist the Board in fulfilling its oversight responsibilities relating to the Company's financial accounting, reporting, compliance and internal controls;

b. Assist the Board in its oversight of the Company's compliance with legal and regulatory requirements; and

c. Assist the Board in its oversight of the Company's internal audit function.

33.    In addition, certain of the Individual Defendants are members of the

Compensation Committee. Pursuant to Zuora's Charter of the Compensation Committee, members were required to, among other things:

    a. Establish, evaluate, and approve the Company's compensation arrangements, plans, and programs; and

    b. Evaluate the performance of the CEO and make decisions regarding the compensation to be provided to executive officers;

34. In addition, certain of the Individual Defendants are members of the Nominating and Corporate Governance Committee. Pursuant to Zuora's Charter of the Nominating and Corporate Governance Committee, members were required to, among other things:

    a. Advise the Board on corporate governance matters; and

    b. Oversee a process for evaluation of the performance of the Board and each committee of the Board

## SUBSTANTIVE ALLEGATIONS

**Company Overview and Background**

35. Zuora is a cloud-based subscription platform that provides software to enable companies across multiple industries and geographies to launch, manage, or transform to a subscription-based model. As described by Zuora, its software functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-revenue process, including billing and

revenue recognition. Zuora's solution enables businesses to easily change pricing and packaging, and to efficiently comply with revenue recognition standards.

36.    Zuora has two primary products: Zuora Billing, a subscription billing software, and Zuora RevPro, a revenue recognition software.

37.    Starting from its Prospectus filed on April 12, 2018, the Company issued multiple statements through SEC filings, press releases, and conferences that led the investing public to believe that: (a) the Company's salesforce was sufficiently trained and staffed; (b) RevPro was adequately integrated into Zuora's existing framework; and (c) the market demand for RevPro would remain relatively strong after the deadline to implement ASU 2014-09[2] had passed. Indeed, the Prospectus highlighted the functionality and integrated features of Zuora's solutions stating, "our solution functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-cash process, including billing and revenue recognition."

38.    To be sure, Defendants' representations about Zuora made its Initial Public Offering a rousing success. On April 16, 2018, the Company announced that

---

[2]    ASU 2014-09, or topic Topic 606, is a revenue recognition standard that affects businesses engaged in contracting with customers for the transfer of goods or services. It was jointly developed by the Financial Accounting Standard's Board and the International Accounting Standards Board. The guidance was originally issued in 2014 but has since been revised several times. The aim of ASU 2014-09 is to establish international alignment on the method by which businesses recognize revenue from contracts with customers. Adherence with ASU 2014-09 is required in the United States by Generally Accepted Accounting Principles ("GAAP") for public entities.

it had closed its IPO selling 12,650,000 shares of its common stock, including full

allotment to underwriters raising over $162.2 million in net proceeds.

**Zuora's Code of Conduct**

39.     On May 8, 2019, the Company filed its 2019 Proxy Statement with the

SEC. In the Proxy, the Company adopted a Global Code of Business Conduct and

Ethics (the "Code of Conduct"). The Code of Conduct "applies to every member . .

. of the Board of Directors (the 'Board'), officer, employee, independent contractor,

and consultant of Zuora."

40.     The Code of Conduct provides that the Company strives for the highest

of ethical standards:

> This Code cannot address every ethical issue or circumstance that may
> arise, so, in complying with the letter and spirit of this Code, ZEOs
> [defined as each member of the Board, officer, employee, independent
> contractor and consultant of Zuora] must apply common sense, together
> with high personal standards of ethics, honesty and accountability, in
> making business decisions where this Code has no specific guideline.

> Zuora expects all of its directors, executives, managers and other
> supervisory personnel to act with honesty and integrity, use due care
> and diligence in performing responsibilities to Zuora to help foster a
> sense of commitment to this Code among all of its ZEOs, and to foster
> a culture of fairness, honesty and accountability within Zuora.

41.     Pursuant to the Code of Conduct, legal compliance should be viewed

as the minimum acceptable standard of conduct:

> Zuora's success depends upon each ZEO performing his or her duties
> to Zuora in compliance with applicable laws and in cooperation with
> governmental   authorities.   Zuora's   success   depends   upon   each

employee operating within legal guidelines and cooperating with authorities. It is essential that each employee knows and understands the legal and regulatory requirements that apply to Zuora's business and to his or her specific area of responsibility.

If any directors have any question in the area of legal compliance, he or she should approach the Chair (or, in the case of the Chair, Zuora's Compliance Officer), and if any ZEOs have any questions in the area of legal compliance, they should approach their supervisor or Zuora's Compliance Officer immediately.

Legal compliance is only a part of Zuora's ethical responsibility, however, and should be viewed as the minimum acceptable standard of conduct. Zuora strives to act with the utmost integrity, not just in its most important corporate decisions, but also in the actions taken every day by its ZEOs and directors. Ethical conduct is a high ideal, but often just means exercising common sense and sound judgment. Acting ethically will help Zuora become a better company, a better commercial partner for other companies, and a better corporate citizen.

42.     The Code of Conduct provides that insider trading is illegal and

unethical:

Every ZEO is prohibited from using "inside" or material nonpublic information about Zuora, or about companies with which Zuora does business, in connection with buying or selling Zuora's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code, Zuora's Insider Trading Policy (the "Insider Trading Policy") and other Zuora policies, to tip or to trade on inside information. ZEOs who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Zuora business.

ZEOs must exercise the utmost care when in possession of material nonpublic information. The Insider Trading Policy provides guidance on the types of information that might be nonpublic and material for these purposes, and guidelines on when and how a ZEO may purchase or sell shares of Zuora stock or other Zuora securities.

43.     The Company's public disclosures must be complete, fair, and

accurate:

> Zuora's disclosure controls and procedures are designed to help ensure that Zuora's reports and documents filed with or submitted to the [SEC] and other public disclosures are complete, fair, accurate, fairly present Zuora's financial condition and results of operations and are timely and understandable. ZEOs who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist Zuora in producing financial disclosures that contain all of the information about Zuora that is required by law and would be important to enable investors to understand Zuora's business and its attendant risks including, but not limited to . . .
>
> - no ZEO should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of Zuora's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.
>
> In connection with the preparation of the financial and other disclosures that Zuora makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines . . .
> - endeavor to ensure complete, fair, accurate, timely and understandable disclosure in Zuora's filings with the SEC;
> - raise questions and concerns regarding Zuora's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;
> - act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and
> - comply with Zuora's disclosure controls and procedures and internal controls over financial reporting.

**Concealing the Difficulties of Zuora Billing and RevPro**

44.    The Individual Defendants breached their fiduciary duties by concealing the existence of significant technical challenges related to the Company's two core products (Billing and RevPro). Indeed, a multitude of false and misleading statements were issued to the public assuring investors that Billing and RevPro were in place to make a significant impact. As detailed below, however, the Individual Defendants were concealing difficulties associated with Zuora Billing and RevPro—to the detriment of both the Company and the Company's stockholders.

45.    At the heart of this complaint (and the Securities Class Action) is the fact that Defendants' materially misrepresented the functionality of Zuora's platform: that customers could not successfully integrate the data from Billing and RevPro—a fundamental technical challenge. As noted above, this allegation—which was sustained in its entirety by the Securities Class Action court—relies on statements by four CWs:

46.    According to the Securities Class Action, CW-1 worked at Zuora from June 2017 to April 2019 as "Senior Manager Global Services/Principal Solution Architect and Zuora Integration Architect," reporting to Vice President Ramamoorthy ("VP Ramamoorthy"), who in turn reported "to the C-suite executives." CW-1 "has extensive knowledge regarding the functionality and implementation of RevPro, as before Zuora acquired Leeyo Software, Inc., CW-1

was employed at Leeyo as a senior software engineer from December 2014 to May 2017 and was responsible for providing product implementation and customization for RevPro." "While employed at Zuora, CW-1 worked to assist Zuora's customers automate their revenue operations and functions with RevPro to comply with ASC 606 . . . this included integrating Zuora RevPro with customers' [certain] systems."

47.     "CW-1 said that for customers using Zuora Billing and Zuora RevPro there was a huge friction in reconciling the two systems. CW-1 said the integration failure stemmed from a source data problem arising from the design of Zuora Billing." "CW-1 explained that the data within Zuora was not very robust and had limitations. CW-1 explained that Zuora needed to come up with a solution that could transport the Billing data into RevPro transaction lines."

48.     According to the Securities Class Action, CW-2 worked at Zuora from October 2017 to September 2018 as a "high-ranking project manager/subject matter expert," and "reported directly to Zuora's C-suite executives, including Chief Information Officer Alvina Antar ("Anter"), who reported to Defendant Sloat." CW-2 "became aware of the issue with reconciling Zuora Billing and RevPro immediately upon coming on board at Zuora," and according to CW-2 "[t]he problem with the RevPro integration was the data source." "CW-2 said the data within Zuora Billing was not very robust, and 'There were some limitations; the data was not structured enough and not uniform.'" CW-2 also said that "'the Zuora

platform is very open for companies to decide how to structure their subscriptions; [but] they did not integrate an engine to extract data and load it into RevPro.'"

49.     According to the Securities Class Action, CW-3 worked at Zuora from June 2018 to July 2019 as an account executive, selling Billing to enterprise and existing customers on the West Coast. CW-3 worked in the San Mateo office and reported to a Vice President.  "CW-3 said that the lack of an integration solution and the fact that customers were unhappy that their products did not work together 'came up in team meetings all the time.' CW-3 and sales colleagues would inform their supervising Vice-Presidents of particular customers who were unhappy and needed a workable integration for Zuora Billing and RevPro."

50.     According to the Securities Class Action, CW-4 worked at Zuora from May 2018 to January 2019 as a Business Development: Strategic Accounts Group Member, working on "large accounts, particularly Fortune 500 accounts." CW-4 was on the Zuora Central team, which was focused on selling the Company's subscription order-to-revenue platform to major companies. CW-4 became familiar with the RevPro product particularly in August or September 2018 in connection with an upcoming DreamForce conference.  "CW-4 explained that when the Zuora Central team began to cross-sell with the RevPro team, CW-4 began to have initial conversations about the products with potential customers and was constantly hearing customers were unhappy with RevPro. CW-4 said that the issue with selling

RevPro was that it was not working with Zuora Central."

51.    Indeed, the Defendants knew of the integration failure before and throughout the Relevant Period based on Zuora's failure to effectively integrate and implement RevPro internally, around October 2017, in a project called "ZoZ."

52.    As alleged in the Securities Class Action, and according to CW-1, Zuora attempted to use an integration platform referred to as MuleSoft. However, according to CW-2, Zuora was deficient in its use of the MuleSoft platform. In particular, CW-2 attributed the problems Zuora experienced using MuleSoft to integrate RevPro to, "'the operation, the business goals, the knowledge, the execution, the planning, and the hard thinking through of the product and the solution.'"

53.    As alleged in the Securities Class Action, Zuora's highest executives were informed of the integration failure occurring on the ZoZ project. The project held weekly ZoZ review meetings which included CW-1 and CIO Antar.  According to CW-1, CIO Antar knew of implementation difficulties and reported these to defendant Sloat. "CW-1 recalled hearing of executive briefings on the internal implementation status on two occasions." CW-2 described Sloat as the "public sponsor" of the ZoZ project. At a project meeting in early 2018, Sloat told the project team that "the market needed a seamless solution and that 'Zuora needed to get its act together with RevPro.'" ZoZ's status was maintained in Google Documents and

email threads; Sloat "would either be copied on [these] . . . or be apprised by CIO Antar." "Although Zuora ultimately implemented RevPro internally, the implementation was incredibly laborious, time and resource intensive, and anything but ideal," requiring manual touchup work in an Excel data file. According to CW-1, Zuora did not complete manual internal implementation until April 2018. Zuora did a two-year retest that continued "into at least March 2019."

54.    As alleged in the Securities Class action, because the internal ZoZ project was failing, in the beginning of early 2018, Zuora opened a new project internally referred to as the "Keystone Project," which was intended to build a connection between RevPro and Zuora Billing to apply to clients' systems." "Zuora's engineering and product teams were running Keystone as a separate project to integrate the two tools using a different engine" than the ZoZ project. The Keystone Project used another solution called OrderMetrics, but again "the source data was not robust enough and not flexible enough." CW-1 worked on the initial phase of the Keystone Project and conferred with others working on it after he was reassigned. "The 'Keystone Project' integration failure was not customer specific, but rather was wide reaching and impacted virtually all of Zuora's customers that had adopted Billing and RevPro.

55.    According to CW-1, Keystone succeeded in helping two or three Zuora customers who "weren't using [Billing]'s full functionality," however, "'80 to 90

percent of customers would not be able to use the Keystone integration,' as candidates for the 'Keystone' integration would only be those limited customers who were not using many features." Keystone Project reports were stored centrally as Google Documents "generally available to all executives." CW-1 further confirmed that Tzuo and Sloat "and other Zuora senior executives were kept aware of the delays in integrating RevPro and its effects on clients at weekly executive meetings." According to CW-1, "the Company's top executives, including [Tzuo and Sloat], participated in weekly calls with the Company's Vice Presidents in which they were briefed on the latest news during weekly calls . . . CW-1 knew of these meetings, because CW-1 gave reports on the latest news to his supervising VP Ramamoorthy, who would then give the information to the executives."

56.    Yet**,** when the Individual Defendants caused Zuora to file its Prospectus with the SEC, Zuora merely identified boilerplate "potential risks" to the Company, without disclosing any of the issues they already knew about—as noted above. For example, the Company provided a disclaimer about its salesforce and the Company's dependability on its salesforce:

> ***Our revenue growth and ability to achieve and sustain profitability will depend, in part on being able to expand our direct sales force and increase the productivity of our sales force.***
>
> To date, most of our revenue has been attributable to the efforts of our direct sales force. In order to increase our revenue and achieve and sustain profitability, we must increase the size of our direct sales force, both in the United States and internationally, to generate additional

revenue from new and existing customers.

We believe that there is significant competition for sales personnel with the skills and technical knowledge that we require. Because our solution is often sold to large enterprises and involves long sales cycle and complex customer requirements, it is more difficult to find sales personnel with the specific skills and technical knowledge needed to sell our solution and, even if we are able to hire qualified personnel, doing so may be expensive. Our ability to achieve significant revenue growth will depend, in large part, on our success in recruiting, training, and retaining sufficient numbers of direct sales personnel to support our growth.

57.     The Prospectus also addressed RevPro and made clear the link between the effectiveness and demand of the product and new accounting standards for revenue recognition (ASU 2014-09):

> **The market for our revenue recognition automation software product, Zuora RevPro, is rapidly evolving as a result of the effectiveness of ASC 606, which makes it difficult to forecast adoption rates and demand for this product, and could have a material adverse effect on our business and operating results.**

58.     On August 30, 2018, Zuora held a conference to discuss the Company's second quarter results for 2018. During this call, Defendant Sloat assured the public that Zuora's products would still be in demand after the implementation deadline of ASU 2014-09. Specifically, Defendant Sloat stated "ASC 606 . . . was a good driver for customers last year . . . what we're seeing is that companies had a timeline that they had to get compliant and a lot of them chose to do that through some kind of manual Band-Aid process . . . **we're seeing those guys now, they're past their first iteration but they know it's not sustainable and they're going to need a revenue**

*automation solution or 606 going forward. So, those customers are still out there*."

59.     On the same call, Defendant Tzuo was asked whether "RevPro has legs beyond just 606 [ASU 2014-09]," and responded, "we actually know it has legs."

60.     Over the next eight months, the Company issued a series of SEC filings and press releases announcing the financial results for the Company. Attached to the SEC filings were SOX certifications signed by certain of the Individual Defendants attesting to the accuracy of each. At no point did the Individual Defendants disclose the difficulties brewing with their two core products.

61.     On March 21, 2019, Zuora issued a press release which was attached to the Company's Form 8-K, filed with the SEC that same day, announcing its financial results for its fourth quarter and full year ended January 31, 2019. The press release disclosed Zuora's income guidance for the fiscal year that began February 1, 2019 (fiscal 2020), with expected revenue of **$289 million - $293.5 million**.

62.     On April 18, 2019, the Company filed its 2019 Form 10-K, which repeated the 2020 revenue guidance offered in the March 21, 2019 press release.

63.     On May 8, 2019, the Company filed its 2019 Proxy Statement with the SEC. Individual Defendants Fenton, Goldman, Haley, Pressman, Tzuo, Volpi, and Yesil solicited the 2019 Proxy Statement, which contained material misstatements

and omissions.3

64.     Indeed, as noted above, the 2019 Proxy Statement provided a Code of

Conduct, which was not followed:

> We are committed to ethical business practices and, accordingly, we
> have adopted a Global Code of Business Conduct and Ethics (Code of
> Conduct) that applies to all the members of our Board of Directors,
> officers and employees. Our Code of Conduct is available on our
> website at https://investor.zuora.com/governance/governance-
> documents. We intend to disclose future amendments to certain
> portions of the Code of Conduct or waivers of such provisions granted
> to executive officers and directors on our website, as permitted under
> applicable New York Stock Exchange and SEC rules.

65.     The 2019 Proxy Statement was false and misleading because the

Company's Code of Conduct was disregarded, as evidenced by the numerous false

and misleading statements alleged herein, the insider trading engaged in by five of

the Individual Defendants, and the Individual Defendants' failures to report

violations of the Code of Conduct.

66.     Furthermore, the Individual Defendants caused the 2019 Proxy

Statement to be false and misleading regarding executive compensation.

Specifically, Defendants' purported to employ "pay-for-performance" elements,

including equity awards designed to incentivize "growth of sustainable long-term

---

3     Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy
Statement are based solely on negligence. They are not based on any allegation of reckless or
knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not
sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,
or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations
and related claims.

value for our stockholders," while failing to disclose that the Company's share price was artificially inflated.

67.     The 2019 Proxy Statement, as well as all other public statements, also failed to disclose that: (a) the Company had focused on RevPro's new customer support, to the detriment of the product's overall integration into Zuora's own operations; (b) Zuora would not focus on integrating RevPro until a full year after its acquisition of Leeyo; (c) this deferral of RevPro's integration would significantly and adversely affect the Company; (d) RevPro's customer base was limited to clients attempting to navigate new accounting standards; (e) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASU 2014-09; and (f) the Company failed to maintain internal controls.

68.     As a result, Defendants' statements regarding the Company's business, operations, and prospects were materially false and misleading.

**The Truth is Revealed**

69.     Defendants' misrepresentations to investors were finally revealed on May 30, 2019. On that day, Zuora issued a press release announcing its first quarter fiscal year 2020 results. Specifically, Zuora announced (a) quarterly revenue growth of 22%, a steep decline from the prior quarter; (b) a decline in customer growth, adding only twenty customers with annual contract value equal to or greater than $100,000, the lowest over the past year; and (c) it lost over $20 million, a loss of

16% year-over-year.

70.    Significantly, Zuora also slashed its fiscal year 2020 total revenue guidance to a range of **$268 - $278 million** from prior guidance of $289 - $293.5 million. The Company also projected subscription revenues of only $200-$206 million, below previous guidance of $209-$211.5 million.

71.    Later that same day, Zuora held an earnings call to discuss its results for the first quarter fiscal year 2020. On the call, Defendant Tzuo explained that the Company "did have some challenges which are impacting our Q2 and our full year outlook." Defendant Tzuo identified "two execution headwinds" that caused the poor financial results and reduced guidance: Billing-RevPro integration challenges and sales execution problems.

72.    Regarding the Billing-RevPro integration challenges, Defendant Tzuo disclosed that the product integration for these two products was "taking longer than expected" while admitting that the Company's growth was conditioned on the Zuora's ability to cross-sell Billing and RevPro. Defendant Tzuo went on: "the technical work to complete the integration is taking time" and the integration challenge "slowed down our cross-sell motion" which "resulted in lower professional services and subscription revenue in the quarter as well as tempered expectations going forward."

73.    Regarding sales execution, Defendant Tzuo revealed that its salesforce

was undertrained and poorly supervised: "What we're seeing in Q1 is that ***the newer reps were less than half as productive than our more experienced reps***. We're finding that we need to improve the support of our new reps with training, and experienced oversight to help them ramp and close new businesses."

74.    To ease investors' minds, Defendant Tzuo reiterated that "the integration of our two flagship products is critically important to us and our customers' success. So I'm personally spending a lot of my time here to drive this to completion." Nevertheless, Defendant Tzuo stated that the Company likely would not have the integration issue resolved until the end of the third quarter of fiscal year 2020.

75.    Analysts were shocked by the Company's disclosures. One Jeffries analyst incredulously stated: "I sort of get the integration of Billings and RevPro and how that could sort of slow some things down. But I know I'm going to get this question tomorrow. ***I mean you bought Leeyo [RevPro] 2 years ago. So like it's hard -- like how can it not be integrated?*** How could that be slowing things down right now?"

76.    Defendant Tzuo attempted to respond: "We did acquire Leeyo [RevPro] a little less than two years ago . . . [t]he first year was really focused on ASC 606, all right and there was such a tight deadline to get the core set up." "So honestly, we didn't really have time and the resources to focus on the integration

between the two until after the 606 [wave] was complete. "*So we didn't really start heavy work on the integration until early last summer, late spring, early last summer. And long story short, we went down one direction that proved to be a dead end, a false direction*."

77.    After the earnings call, analysts expressed further surprise. For example, in a May 30, 2019 report to investors entitled "Another-drama filled quarter," a Canaccord Genuity analyst stated that "Zuora was a mess" and that it was "executing far below potential." Among other things, the Canaccord Genuity analyst cited the "[l]onger-than-anticipated progress to integrate modules of RevPro and Billing forced Zuora to elongate deployment (and therefore, revenue recognition for those add-on sales." Likewise, Needham analyst Scott Berg reportedly named Zuora's stock "dead money for a quarter or two."

78.    On this news, Zuora's stock plummeted nearly 30%, from $19.90 per share on May 30, 2019, to $13.99 per share on May 31, 2019, representing the worst day of trading in Zuora stock history and obliterating roughly $520 million of market capitalization.

79.    As noted below, while Defendants concealed the Company's issues, insiders were dumping their stock while in possession of this material, nonpublic information related to Zuora's two core products.

**Insider Trading**

80.     The Company's stated Insider Trading Policy provides that every Zuora employee, referred to as a ZEO, "is prohibited from using 'inside' or material nonpublic information about Zuora, or about companies with which Zuora does business, in connection with buying or selling Zuora's … securities … ZEOs who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Zuora business."

81.     In violation of this stated policy, and this country's securities laws, certain of the Individual Defendants unloaded over $49 million in insider trades that were both unusual and suspicious in terms of size, timing, and trading pattern.

82.     Upon information and belief, although the Individual Defendants listed below enacted their trades pursuant to Rule 10b5-1 trading plans, the plans were adopted during the Relevant Period when the Individual Defendants were already in possession of material, nonpublic information about the difficulties associated with Billing and RevPro.

83.     During the Relevant Period—when the Defendants materially misstated information to the investing public to keep the stock price artificially inflated, and before the scheme was exposed—Defendant Sloat made approximately $16.9 million in insider sales, Defendant Diouane made approximately $11.1 million

in insider sales, Defendant Goldman made approximately $700,000 in insider sales, Defendant Pressman made approximately $39,000 in insider sales, and Defendant Volpi made approximately $21 million in insider sales. The sales made by each are illustrated in the following charts:

**Sloat:**

| Transaction Date | Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| Sept. 5, 2018 | 344,009 | $26.10 | $8,978,635 |
| March 26, 2019 | 364,528 | $20.04 | $7,305,870 |
| March 28, 2019 | 35, 472 | $20.00 | $709,440 |
| **Total** | **744,009** | | **$16,993,944** |

**Diouane:**

| Transaction Date | Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| Sept. 5, 2018 | 34,200 | $25.90 | $885,663 |
| Dec. 6, 2018 | 130,500 | $18.03 | $2,352,393 |
| March 26, 2019 | 130,000 | $19.76 | $2,568,391 |
| April 29, 2019 | 240,000 | $22.19 | $5,326,680 |
| **Total** | **534,700** | | **$11,133,127** |

**Goldman:**

| Transaction Date | Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| March 26, 2019 | 35,000 | $19.92 | $697,200 |
| **Total** | **35,000** | | **$697,200** |

**Pressman:**

| Transaction Date | Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| Dec. 17, 2018 | 1,050 | $17.87 | $18,764 |
| March 26, 2019 | 1,040 | $19.76 | $20,550 |
| **Total** | **2,090** | | **$39,314** |

**Volpi:**

| Transaction Date | Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| Sept. 5, 2018 | 28,780 | $26.52 | $763,246 |
| Dec. 11, 2018 | 137,629 | $18.66 | $2,568,157 |
| Dec. 12, 2018 | 563,941 | $18.77 | $10,585,173 |
| Dec. 13, 2018 | 44,800 | $18.44 | $826,112 |
| Dec. 14, 2018 | 23,471 | $18.32 | $521,589 |
| Dec. 19, 2018 | 95,398 | $18.22 | $1,738,152 |

| Dec. 20, 2018 | 39,762 | $18.26 | $726,054 |
|---|---|---|---|
| Jan. 4, 2019 | 161,116 | $18.43 | $2,969,368 |
| March 26, 2019 | 19,187 | $19.48 | $373,763 |
| **Total** | **1,114,084** | | **$21,071,614** |

84.     These trades all occurred during the Relevant Period when the Individual Defendants were in possession of material, nonpublic information related to the true functionality of Zuora's two core products.

## DAMAGES TO THE COMPANY

85.     As a direct and proximate result of the Individual Defendants' conduct, Zuora has been seriously harmed and will continue to be seriously harmed. Such harm includes, but is not limited to:

   a) Legal fees associated with the Securities Class Action filed against the Company, its President and CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators;

   b) Any funds paid to settle the Securities Class Action; and

   c) Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties.

86.     In addition, as a direct and proximate result of the Individual Defendants' conduct, Zuora has also suffered and will continue to suffer a loss of

reputation and goodwill with its business partners, regulators, and stockholders.

87.   For at least the foreseeable future, Zuora will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Zuora's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE ALLEGATIONS

88.   Plaintiff brings this action derivatively in the right and for the benefit of Zuora to redress injuries suffered, and to be suffered, by Zuora as a direct result of breaches of fiduciary duty by the Individual Defendants, unjust enrichment, waste of corporate assets, and violations of the Exchange Act.

89.   Zuora is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

90.   Plaintiff will adequately and fairly represent the interests of Zuora in enforcing and prosecuting its rights.

91.   Plaintiff has continuously been a stockholder of Zuora at times relevant to the wrongdoing complained of and is a current Zuora stockholder.

## DEMAND FUTILITY ALLEGATIONS

92.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

93.    A pre-suit demand on the Board of Zuora is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven Individual Defendants: Defendants Tzuo, Fenton, Goldman, Haley, Pressman, Volpi, and Yesil (collectively, the "Directors"). Plaintiff only needs to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

94.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while three of them engaged in insider sales based on material non-public information, netting proceeds of over $21 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

95.    The Directors abandoned their fiduciary duties. Indeed, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The

fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors failed to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf.

96.    As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and accordingly excused.

97.    Demand on Defendant Tzuo is futile for additional reasons. Specifically, Defendant Tzuo is not an independent director, as the Company itself admits. Defendant Tzuo is the co-founder of the Company and has served as the Company's Chairman and CEO since its inception. Defendant Tzuo also serves as a member of the Board. The Company provides Defendant Tzuo with his principal occupation, and receives lucrative compensation, including $1,996,581 during the fiscal year ended January 31, 2019. Defendant Tzuo was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings calls and press releases, most of which he personally made statements in, and the Company's SEC filings issued during the Relevant Period, which he signed and/or signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if

any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In violation of the Code of Conduct, he failed to uphold his duties to ensure that the Company remained in compliance with relevant laws and regulations surrounding Zuora's public statements. Moreover, Defendant Tzuo is a defendant in the Securities Class Action. For these reasons, too, Defendant Tzuo breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon him is accordingly futile and therefore, excused.

98. Demand on Defendant Fenton is futile for additional reasons. Defendant Fenton has served as a Company director since December 2007 and serves as a member of the Audit Committee. Defendant Fenton conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Fenton signed, and thus personally made the false and misleading statements in the 2019 Form 10-K. For these reasons, too, Defendant Fenton breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand

upon him is accordingly futile and therefore, excused.

99.     Demand on Defendant Goldman is futile for additional reasons. Defendant Goldman has served as a Company director since February 2016 and serves as Chair of the Audit Committee. Defendant Goldman receives lucrative compensation, including $187,483 during the fiscal year ended January 31, 2019. As Chair of the Audit Committee and a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Goldman signed, and thus personally made the false and misleading statements in the Form 2019 10-K. His insider sale before the fraud was exposed, which yielded $697,200 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Goldman breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon him is accordingly futile and therefore, excused.

100.    Demand on Defendant Haley is futile for additional reasons. Defendant Haley has served as a Company director since October 2010 and serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As a Company director he conducted little, if any, oversight

of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Haley signed, and thus personally made the false and misleading statements, in the 2019 Form 10-K. For these reasons, too, Defendant Haley breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon him is accordingly futile and therefore, excused.

101.   Demand on Defendant Pressman is futile for additional reasons. Defendant Pressman has served as a Company director since November 2008 and serves on the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Pressman signed, and thus personally made the false and misleading statements in the 2019 Form 10-K. His insider sales before the fraud was exposed, which yielded $39,314 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Pressman breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand

upon him is accordingly futile and therefore, excused.

102.  Demand on Defendant Volpi is futile for additional reasons. Defendant Volpi has served as a Company director since November 2011 and serves as a member of the Audit Committee. As an Audit Committee member and trusted Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarding his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Volpi signed, and thus personally made the false and misleading statements, in the 2019 10-K. His insider sales before the fraud was exposed, which yielded approximately $21 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Volpi breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon him is accordingly futile and therefore, excused.

103.  Demand on Defendant Yesil is futile for additional reasons. Defendant Yesil has served as a Company director since May 2017. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Yesil receives lucrative compensation, including $189,358 during the fiscal year ended January 31, 2019. As a trusted Company director, she conducted little, if any,

{00376783;1 }                           – 40 –

oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Yesil signed, and thus personally made the false and misleading statements in, the 2019 10-K. For these reasons, too, Defendant Yesil breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon him is accordingly futile and therefore, excused.

104.   Demand on the Board is futile for additional reasons.

105.   As described above, three of the Directors on the Board directly engaged in insider trading. Defendants Goldman, Pressman, and Volpi collectively received proceeds of over $21 million as a result of insider transactions executed during the period when the Company's stock price was artificially. Therefore, demand in this case is futile as to them, and thus excused.

106.   Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the stockholders. For example, Defendants Tzuo and Yesil worked closely together at SalesForce as core members of the newly founded Company from

1999 to 2005. Defendants Fenton and Volpi also have multiple business relationships, having both served on the Board of Directors of Hortonworks, Inc. from 2011 to January 2019 and both currently serve on the board of Elastic N.V. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

107.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile.

108.   Zuora has been and will continue to be exposed to significant losses due to the wrongdoing complained of, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zuora any part of the damages Zuora suffered and will continue to suffer. Thus, any demand upon the Directors would be futile.

109.   The Individual Defendants' conduct described herein and summarized

above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Thus, any demand upon the Directors would be futile.

110.   The acts complained of herein constitute violations of fiduciary duties owed by Zuora officers and directors, and these acts are incapable of ratification.

111.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zuora. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Zuora, there would be no directors' and officers' insurance protection.

Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

112.   If there is no directors' and officers' liability insurance, then the Directors will not cause Zuora to sue the Individual Defendants named herein. If they did, they would face uninsured individual liability. Accordingly, demand is futile and excused.

113.   For the reasons noted above, at least four of the Directors cannot consider a demand with disinterestedness and independence. Accordingly, a demand on the Board is futile and excused.

## COUNT I

### Against Individual Defendants for Violations of Section 14(a) of the Exchange Act

114.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

115.   The Section 14(a) claims are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation

of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

116.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

117.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

118.   Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (a) the Company had focused on RevPro's new customer support, to the detriment of the product's overall integration into Zuora's own operations; (b) Zuora would not focus on integrating RevPro until

a full year after its acquisition of Leeyo; (c) this deferral of RevPro's integration would significantly and adversely affect the Company; (d) RevPro's customer base was limited to clients attempting to navigate new accounting standards; (e) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASU 2014-09; and (f) the Company failed to maintain internal controls.

119.   The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to incentivize "the growth of sustainable long-term value for [Zuora's] stockholders," while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

120.   The 2019 Proxy Statement also made references to the Code of Conduct, which required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2019 Proxy Statement failed to disclose these

violations and also failed to disclose that the Code of Conduct's terms were being violated.

121.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including, but not limited to, election of directors and ratification of an independent auditor.

122.   The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Haley and Yesil, which allowed them to continue breaching their fiduciary duties to Zuora.

123.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

124.   Plaintiff on behalf of Zuora has no adequate remedy at law.

## COUNT II

**Against Individual Defendants Tzuo and Sloat For Contribution Under §§10(b) and 21D of The Exchange Act**

125.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

126.   This claim is brought derivatively on behalf of the Company for

contribution and indemnification against defendants Tzuo and Sloat, each of whom is a named individual defendant in the Securities Action.

127.   The Company is named as a defendant in the Securities Action, which asserts claims under the federal securities laws for, among other things, violation of §10(b) of the Exchange Act.  If the Company is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of defendants Tzuo and/or Sloat, as alleged herein.  The Company is entitled to receive contribution from those two Individual Defendants in connection with the Securities Action against the Company.

128.   As directors and/or officers of the Company, defendants Tzuo and Sloat had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about the Company, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

129.   Defendants Tzuo and Sloat are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the

Exchange Act.

130.   Accordingly, the Company is entitled to all appropriate contribution or indemnification from defendants Tzuo and Sloat, who are responsible for exposing the Company to liability under the federal securities laws.

## COUNT III

### Against Individual Defendants for Breach of Fiduciary Duties

131.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zuora's business and affairs.

133.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

134.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zuora.

135.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and

internal controls. In further breach of their fiduciary duties owed to Zuora, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (a) the Company had focused on RevPro's new customer support, to the detriment of the product's overall integration into Zuora's own operations; (b) Zuora would not focus on integrating RevPro until a full year after its acquisition of Leeyo; (c) this deferral of RevPro's integration would significantly and adversely affect the Company; (d) RevPro's customer base was limited to clients attempting to navigate new accounting standards; (e) consequently, demand for RevPro's software would foreseeably diminish after the implementation deadline for ASU 2014-09; and (f) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

136.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

137.   In breach of their fiduciary duties, ten of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact

discussed herein.

138.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

139.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The

Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

140.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zuora has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142.   Plaintiff on behalf of Zuora has no adequate remedy at law.

## COUNT IV

### Against Individual Defendants for Unjust Enrichment

143.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zuora.

145.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses,

stock options, or similar compensation from Zuora that was tied to the performance or artificially inflated valuation of Zuora, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

146.   Plaintiff, as a shareholder and a representative of Zuora, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

147.   Plaintiff on behalf of Zuora has no adequate remedy at law.

## COUNT V

### Against Individual Defendants for Waste of Corporate Assets

148.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

149.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

150.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

151.   Plaintiff on behalf of Zuora has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Zuora, demands judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Zuora and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zuora;

C. Determining and awarding to Zuora the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest;

D. Directing Zuora and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zuora and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

i.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into

the policies and guidelines of the Board;

    ii.   a provision to permit the stockholders of Zuora to nominate at least four

candidates for election to the Board; and

   iii.   a proposal to ensure the establishment of effective oversight of

compliance with applicable laws, rules, and regulations.

E.  Awarding Zuora restitution from the Individual Defendants, and each of them;

F.  Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.


Dated: May 28, 2020               **O'KELLY & ERNST, LLC**

                                        */s/ Ryan M. Ernst*
                                        Ryan M. Ernst (No. 4788)
                                        824 N. Market Street, Suite 1001A
                                        Wilmington, DE 19801
                                        Phone: (302) 778-4000
                                        Fax: (302) 295-2873
                                        rernst@oelegal.com

                                        *Attorneys for Plaintiff*

OF COUNSEL:

**POMERANTZ LLP**
Gustavo F. Bruckner, Esquire
Daryoush Behbood, Esquire
600 Third Avenue
New York, NY 10016
(212) 661-1100